UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

TINA TUCKER,                    )
      Plaintiff,              )
                                )
v.                              )   No. 14 CV 50021
                                )   Magistrate Judge Iain D. Johnston
CAROLYN COLVIN, Acting          )
Commissioner of Social Security,)
      Defendant.              )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Tina Tucker, brings this action under 42 U.S.C. § 405(g), seeking reversal of the denial of disability benefits. As explained below, the case is remanded.

## BACKGROUND

On February 7, 2011, plaintiff Tina Tucker filed applications for disability insurance benefits and for supplemental security income, alleging back and mental health problems. She was then 42 years old, and last worked in 2007, as a bartender. The summary of the facts below largely follows the narration set forth in plaintiff's opening brief.

**Back problems.** Although the record contains sporadic reference to earlier back problems, plaintiff's brief starts by describing an incident in March 2010 when her young grandson attempted to jump out of her arms, causing her to injure her arm and neck. Dkt. #9 at 1. As a result, she saw her regular physician, Dr. Geller, who she had seen for at least three years for various issues. He ordered an MRI, which was done on March 7th, and then referred her to Dr. Fred Sweet at the Rockford Spine Center who plaintiff saw several times over the next six months. Plaintiff first saw Dr. Sweet on March 22nd. He noted that plaintiff had "a depressed left biceps and brachioradialis reflex compared to the right," that she had "approximately 4/5

strength in the left biceps and triceps compared to the right," and that she had "a positive Spurling's maneuver to the left reproducing her left upper extremity pain." R. 211. He reviewed the March 7th MRI and noted that she had "[l]eft C5-6 and C6-7 disc osteophyte complexes with spondylotic radiculopathy." R. 212. Because plaintiff wanted to avoid surgery, he recommended that she try steroid injections.

Dr. Sweet next saw plaintiff on May 3, 2010. R. 209-10. According to Dr. Sweet, plaintiff was "quite a bit better" and the symptoms in her neck were "currently tolerable." R. 210. In her brief, plaintiff states that she "continued to complain of ongoing pain" in her lumbar and cervical regions. Dkt. #9 at 2. As support for this contention, plaintiff cites to May 3rd notes from a physical therapist (Phil Oliveri) who plaintiff saw as part of this same visit. R. 219.

Plaintiff last saw Dr. Sweet on August 16, 2010. R. 208. Plaintiff states in her brief that Dr. Sweet noted "painful range of motion in her neck." Dkt. #9 at 2. The notes from this visit contain a reference arguably supporting this assertion, although Dr. Sweet also noted that plaintiff is "overall doing fairly well." R. 208. Dr. Sweet recommended that plaintiff continue with conservative treatments and call if she had any radicular complaints. Plaintiff apparently did not, as this August visit was "the end of her treatment with Dr. Sweet." Dkt. #9 at 2.

Plaintiff's back problems reemerged in early 2011 when she got into a physical altercation with her adult son. Her son "grabbed [her] left arm and [swung] [her] to the street," and "[s]ince then," she has had "constant pain in [her] [shoulder]." R. 242. It is not clear whether plaintiff sought any treatment for these new complaints. Around this same time, plaintiff sought a consultation for sleep apnea on February 3, 2011. The doctor who examined her (Dr. O'Neil) noted that she had decreased range of motion in her left arm. R. 327.

**Mental Health Problems.** The following facts are again taken from, and follow the general layout in, plaintiff's opening brief. In November 2007, she sought treatment from her regular physician, Dr. Geller, "for a nearly life-long history of poor attention span, hyperactivity, poor concentration, and fatigue." Dkt. #9 at 3. Dr. Geller's notes refer to ADHD and "situation depression" linked to ongoing marital stress. R. 315. Dr. Geller prescribed Concerta and Paxil and referred plaintiff to a counselor for the marital problems and the ADHD.

The next event recounted in the brief is a May 5, 2009 visit to Dr. Geller in which plaintiff reported that her depression had worsened to the extent that she was having fairly frequent suicidal thoughts. Dkt. # 9 at 3. Dr. Geller changed some of her medications.

In June 2010, plaintiff again saw Dr. Geller whose notes state "ADHD, currently out of control." R. 322. Dr. Geller gave plaintiff a trial of several new medications. On August 3, 2010, plaintiff was given a consultative examination by psychologist Kelly Renzi, who diagnosed her with posttraumatic stress disorder and personality disorder and assessed her GAF as 55. R. 195.

In January 2011, plaintiff saw a psychiatrist, Dr. Syed Irfan, who diagnosed her with depressive disorder; PTSD in partial remission; and rule out attention deficit/hyperactivity disorder, inattentive type. R. 201. He rated her GAF as 50. He prescribed various medications, and then saw her again in February and March of 2011. R. 197-198.

**Hearing and Decision.** On November 14, 2012, a hearing was held before an administrative law judge ("ALJ"). Plaintiff testified that she has "lower back pain all the time" which was worse if she is "walking a long distance or sitting for too long." R. 22. She has an adjustable bed because she cannot sleep on a flat mattress. She has throbbing pain at the top of the neck. She can walk a block but then her back will "feel like it's been put on fire," causing her

to lie down. She takes painkillers twice a day and has a TENS unit if the pain gets "super bad." R. 25. She sleeps four hours at night before pain wakes her up, and she takes two naps a day.

Plaintiff's grandson lived with her from when he was two months old until he was two years old and then was returned to his mother. R. 29. Plaintiff does the cooking and shopping for the family and the laundry, although her husband and teenage son help with the laundry. Plaintiff's younger son is involved in drama programs and she has gone to watch "a couple" of his productions. R. 31. With the computer, plaintiff plays video games on Facebook and talks to a cousin who lives in South Carolina. She is on the computer for 15 to 20 minutes a time, three to four times a day.

On November 30, 2012, the ALJ found that plaintiff had the following severe impairments: left shoulder marrow/edema contusion, degenerative disc disease, sleep apnea, depression, post-traumatic stress disorder, personality disorder, attention deficit hyperactivity disorder, and obesity. The ALJ found that did not meet a listing and had the residual functional capacity ("RFC") to perform sedentary work with an hourly sit/stand option. R. 55.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit

has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). If the Commissioner's decision lacks evidentiary support or adequate discussion, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

Plaintiff raises three arguments. The first two focus on the listings analysis at Step Three while the third is directed at the ALJ's credibility analysis at Step Four.

**I.     First Argument**

Plaintiff argues that the ALJ failed to adequately analyze Listing 1.04(A). Although not quoted by plaintiff in her opening brief, this listing states the following:

> **1.04** *Disorders of the spine* (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral facture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord. With:
>
> > A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A). The ALJ, who likewise did not quote this provision nor even mention listing 1.04(A) by name, provided the following explanation:

> The claimant's left shoulder marrow/edema contusion, degenerative disc disease, osteoarthritis, and obesity did not meet or equal any of the criteria for section 1.00 (musculoskeletal system), because there is no evidence of major dysfunction of a

- 5 -

> joint, disorder of the spine, or any of the specific neurological deficits required under this section.

R. 54. In her opening brief, plaintiff makes a straightforward argument. She first asserts that the above analysis is perfunctory. Then she notes that the Seventh Circuit has frequently remanded in this very type of situation, relying on these cases: *Kastner v. Astrue*, 697 F.3d 642, 647 (7th Cir. 2012) (ALJ's cursory analysis of Listing 1.04(A)—that claimant "did not display limitation of motion of the spine as anticipated by section1.04A—was not sufficient); *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (ALJ's "two-sentence discussion" of Listing 1.04(A) was "cursory"); *Taylor v. Barnhart*, 189 Fed. Appx. 557, 562 (7th Cir. 2006) (ALJ "never identified Listing 1.02A (joints) or 1.04A (spine) by name"); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (two-sentence "perfunctory" listing analysis was inadequate). Another case that could be added to this list, one issued after plaintiff filed her opening brief, is *Minnick v. Colvin*, 775 F.3d 929, 935-36 (7th Cir. 2015). There, the Seventh Circuit stated that the ALJ's two-sentence discussion contained "no analysis whatsoever" and was "the very type of perfunctory analysis we have repeatedly found inadequate." *Id.*

Plaintiff finally argues that, although the ALJ never analyzed the relevant evidence, there is in fact evidence that she meets Listing 1.04(A). Dkt.#9 at 4-5. Specifically, she cites to the March 2010 MRI showing that she had disc bulges in her cervical spine at C3-4 and C5-6, which in turn affected the neuroforamen in her spine. She further points to evidence that she believes shows she suffered from radiating pain, numbness, weakness, decreased strength, and limited range of motion in her left arm and neck. *Id.* (citing R. 207-08, 210-11, 213). This evidence, plaintiff argues, meets the requirements of 1.04(A) by showing nerve root compression, limitation of motion of the spine, motor loss, and sensory or reflex loss.

The Government essentially concedes that the explanation quoted above was cursory and failed to address the relevant evidence. The Government agrees that there is "*some evidence* that indicates [plaintiff] *may have* satisfied *parts* of the Listing." Dkt. #10 at 5 (emphasis added). Although the Government does not go on to identify what the specific evidence is, nor which specific parts it believes may have been met, the Government at least acknowledges that some evidence *arguably* supports plaintiff's claim, something the ALJ's analysis fails to do.

Rather than defend the ALJ's explicit analysis, the Government instead mounts a two-front salvage operation. First, it argues that the ALJ *implicitly* considered the relevant evidence later in the RFC analysis. Second, the Government alternatively argues that the decision should be affirmed under the harmless error doctrine.

Although this Court has doubts about the ultimate viability of plaintiff's listing argument, it finds that, under present Seventh Circuit case law, the Government's arguments are unavailing. The Government first argues that, although the ALJ did not "provide a detailed analysis," the ALJ "*reference[d]* all the relevant findings and medical evidence." Dkt. #10 at 5 (emphasis added). This argument is a bit of a sleight of hand, as is suggested by the word "reference." As noted above, the ALJ did not acknowledge, and certainly did not analyze, *any* of the evidence in the listings analysis part of the opinion. This would be the logical place to discuss what evidence supports (or does not support) the ALJ's listings-related conclusions. The Government's argument rests on the fact that later in the opinion—specifically in the Step Four RFC discussion—the ALJ *referred* to *some* of the evidence potentially relevant to the listing analysis. However, this approach is not sufficient. For one thing, the ALJ referred to the evidence mostly in a neutral and non-evaluative way as part of a chronological narrative of plaintiff's doctor visits. The ALJ provided little explicit analysis, and never connected the evidence back to the

specific 1.04(A) requirements. This Court thus cannot determine that the ALJ in fact implicitly considered this evidence. *See Minnick*, 775 F.3d at 936 (with no explicit analysis by the ALJ, a court cannot tell whether the ALJ "considered and dismissed" the pertinent evidence or whether the ALJ "completely failed to consider [it]").

In the few places where the ALJ made references arguably referring back to 1.04(A), the ALJ did so in a way that raises more questions than answers. To cite one example, the ALJ stated that an MRI did not show any "*significant* nerve root compression." R. 57 (emphasis added). The phrase "nerve root compression" is part of Listing 1.04(A). However, as plaintiff points out, the listing does not include the qualifier "significant." Moreover, as plaintiff also points out, even if it did contain such a requirement, the ALJ did not explain *why* it was not significant. This point is not obvious, as Dr. Sweet's observations (quoted above) do not clearly state that the nerve root compression was not serious. On top of these problems, the Court notes that the ALJ appears to have focused on the wrong MRI. There are references in the record to two MRIs, one from March 7, 2010, which plaintiff is now relying on. It was directed at plaintiff's cervical problems, as is evident by the reference to disc degeneration in C5-C6. But there was a later MRI in April 2010 of plaintiff's lumbar spine. *See* R. 268. This appears to be the MRI the ALJ was referring to when stating that plaintiff had no "significant" nerve root compression. R. 57 (citing R. 210). Another example where the ALJ obliquely nodded back to 1.04(A) is the statement that plaintiff had "negative straight leg raising texts on clinical exams." R. 58. Although 1.04(A) contains a requirement that there be a positive straight leg test, this applies only if the claim is based on pain in the lower back. As noted above, plaintiff is not making such a claim and thus this requirement is not applicable. In addition, the ALJ did not address other evidence, such as that cited in plaintiff's opening brief and summarized above, arguably supporting plaintiff's theory of

the case. *See, e.g., Minnick*, 775 F.3d at 936 (ALJ erred by failing to "acknowledge several aspects of the record" that may have satisfied the listing). In sum, the Government's argument that the ALJ implicitly analyzed the listing is unpersuasive for multiple reasons.

The Government's second argument is that the ALJ's decision can be affirmed under the harmless error doctrine. As factual support for this argument, the Government points to three pieces of evidence supposedly undermining plaintiff's claim that she had "the requisite motor loss with muscle weakness accompanied by sensory or reflex loss," one the specific 104(A) requirements. Dkt. #10 at 5. The evidence consists of the following: (1) in April 2010, Dr. Sturm reported that plaintiff had full muscle strength; (2) in August 2010, Dr. Sweet reported that plaintiff's "neurologic exam for motor, sensation, and deep tendon reflexes is within normal limits in both the upper and lower extremities"; (3) in February 2011, Dr. O'Neil noted normal tone and bulk in a motor examination. *Id.* As legal support for its harmless error argument, the Government relies on two 1999 Seventh Circuit cases: *Henderson v. Apfel*, 179 F.3d 507 (7th Cir. 1999) and *Maggard v. Apfel*, 167 F.3d 376 (7th Cir. 1999). The Government does not address in any way the *Kastner* line of cases plaintiff is relying on.

In making this argument, the Government does not acknowledge that its harmless error argument must be squared with the *Chenery* doctrine, which "forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); *Kastner*, 697 F.3d at 649 (because "the ALJ never referenced motor loss as a basis for the determination at step 3," the Government's theory is "speculation barred by the *Chenery* doctrine"). This doctrine is applicable here because the ALJ did not rely on the evidence the Government now cites to. One of the three doctor visits—the February 2011 visit—is not mentioned by the ALJ. As for the other two, the ALJ did refer to

them generally, but did so by pointing to *different* observations than did the Government. For example, for the April 2010 visit with Dr. Sturm, the Government cited to the record at page 269 (an April 16, 2010 office visit) for the proposition that plaintiff "had full muscle strength." In contrast, the ALJ cited to the record at page 273 (a visit with Dr. Sturm two weeks earlier) for the proposition that "plaintiff underwent a cervical epidural steroid injection," a fact not supportive of any larger point insofar as this Court can tell. Similarly, for the August 2010 visit with Dr. Sweet, the Government cited to page 208 for the proposition that plaintiff's neurologic exam was normal. In contrast, the ALJ cited to page 206 for the proposition that Plaintiff "reported experiencing neck and left arm pain," a point supporting plaintiff's theory. In short, the Government and the ALJ are, literally, not on the same page(s). Moreover, although it has attempted to build a supporting rationale for the ALJ's conclusion, the Government still did not address the contrary evidence such as Dr. O'Neil's observation in February 2011 that plaintiff had "decreased range of motion of the left arm and decreased sensation in the left arm." R. 327.

To return to the case law and plaintiff's original argument, plaintiff is correct that the Seventh Circuit in *Kastner* and related cases has repeatedly faulted ALJs—and thus ordered a remand—where the listing analysis consisted of the same type of conclusory one-sentence analysis as is present here. In those cases, the Seventh Circuit did not discuss whether (and how) the harmless error doctrine should apply in light of *Chenery*. At the same time, in several of these cases, the Seventh Circuit did go on to discuss the evidence and made findings that the evidence was, for example, "significant," which could be viewed as a *de facto* harmless error analysis. *See, e.g.*, *Kastner*, 697 F.3d at 648 (7th Cir. 2012) ("Because the only evidence in the record demonstrated *significant limitations* in Kastner's range of motion, the ALJ's contrary conclusion is peculiar and unexplained.") (emphasis added); *Minnick*, 775 F.3d at 936

("Minnick's degenerative disc disease *may well have satisfied* Listing 1.04A") (emphasis added). It is thus not clear to this Court how much leeway there is in this type of situation for the application of the harmless error doctrine.[1]

In any event, the Court finds that several reasons counsel against reliance on the harmless error doctrine here. First, as explained above, although the Government did a better job than the ALJ in justifying the result, the ALJ still did not address the contrary evidence cited by plaintiff in her opening brief. Second, after the Government raised the harmless error doctrine in its response brief, plaintiff in her reply brief pointed to yet more evidence that should have been considered. Thus, if this Court were to rely on the harmless error doctrine, it would essentially have to review much of the evidence on a blank slate and construct a justification from the ground up. This is a task more properly given to the ALJ in the first instance. Third, just because a claim is weak does not mean harmless error applies. *See Parker*, 597 F.3d at 924. Although weak, the evidence here does not reach the level of certainty necessary to apply the harmless error doctrine. *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).

In remanding the case, the Court is not suggesting that the ALJ reach any particular result on remand. As the Government's response brief has shown, the evidence regarding plaintiff's neck problems is not especially strong and there is a question whether her more serious symptoms were tied to the two accidents and were thus not permanent problems expected to last at least 12 months. This is an issue the ALJ can explore on remand.

---

[1] Strong arguments can be made that the Seventh Circuit should revisit its entire application of *SEC v. Chenery Corp.*, 318 U.S. 80 (1943) in Social Security cases. *See, e.g., Senn v. Astrue*, 2013 U.S. Dist. LEXIS 23794, *18-24 (E.D. Wisc., Feb. 21, 2013) (providing an excellent analysis and request that the Seventh Circuit revisit this jurisprudence); Note, *Taking It On The Chenery: Should the Principles of Chenery I Apply in Social Security Disability Cases?*, 86 Notre Dame L. Rev. 2157 (2011) (questioning the application of the doctrine in Social Security appeals). Obviously, this Court is bound by Seventh Circuit case law and follows that jurisprudence. But this Court echoes Judge Griesbach's request in *Senn*.

## II. Second Argument

Plaintiff argues that the ALJ erred in finding that she did not meet a mental health listing. Unlike with the analysis of Listing 1.04(A), here, the ALJ provided a more explicit and longer analysis. The ALJ concluded that plaintiff had mild restrictions in activities of daily living, and moderate restrictions in social functioning and in concentration, persistence or pace. The ALJ stated that plaintiff was able to perform a wide range of activities, including, driving, cooking, shopping, watching her son's drama performances, playing computer games, and taking care of her young grandson. The ALJ also noted that she "maintains relationships" with her husband, children, and grandson.

In her opening brief, plaintiff argues that the ALJ provided a cursory analysis, cherry-picked evidence, and failed to call a medical expert. Plaintiff believes that substantial evidence shows she meets Listing 12.04 (depression). She relies on this evidence: "she experienced weight gain due to depression (Tr. 436), insomnia (Tr. 317), difficulty concentrating (Tr. 325), and agitation (Tr. 436)." Dkt. #9 at 7. As an initial point, this evidence is not strong. It consists of four complaints plucked from numerous doctor visits with Dr. Geller over a nearly three-and-half year span. It is far from clear that these symptoms were caused by her depression. In many instances, Dr. Geller speculated that the problem may have been caused by a situational factor. *See, e.g.* R. 317 (insomnia "all began about the time [plaintiff] started medication"); R. 325 (plaintiff lost concentration "[a]s a result" of her psychiatrist taking her off ADHD medication); R. 436 (depression may be due to "external reason" that plaintiff's husband had been less intimate in the last six months). Indeed, in making this argument, plaintiff engages in the precise kind of cherry-picking that ALJs are prohibited from doing. *Miller v. Colvin*, 2015 U.S. Dist. LEXIS 54874, *14-15 (N.D. Ill. Apr. 27, 2015).

More significantly, plaintiff has not explained why these periodic complaints are inconsistent with the ALJ's analysis of the paragraph B criteria. It is not as if the ALJ found that plaintiff had no symptoms. The ALJ found, for example, that she had moderate difficulties in concentration and acknowledged that she "experienc[ed] problems remembering details, instructions, and appointments." R. 54. Plaintiff does not explain why one additional observation that she was having problems concentrating would be enough to change the finding from moderate to marked. *Pepper v. Colvin*, 712 F.3d 351 362 (7th Cir. 2013) (ALJs are not required to provide a written analysis of every piece of evidence).

The above arguments would not justify a remand. In her reply brief, plaintiff raises a new argument, pointing out that she saw a psychiatrist, Dr. Irfan, who made observations she believes help her listings argument. Specifically, Dr. Irfan observed that she "exhibited a mildly dysphoric mood and constricted affect on mental status examination" and assessed her GAF as 50. Dkt. #11 at 5. Plaintiff argues that the ALJ ignored these observations. Although it is not clear whether this evidence would be enough to change the result, the ALJ should have at least considered it by applying the checklist under the treating physician rule. *See* 20 C.F.R. § 404.1527(c)(2); *Larson v. Astrue*, 615 F.3d, 744, 751 (7th Cir. 2010); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (same). However, because plaintiff only raised the argument in her reply brief, this Court would not remand on this ground alone. In fact, raising arguments for the first time in a reply brief is dirty pool. *Schenberg v. Leventhal*, 2012 Bankr. LEXIS 1328, *9 n.3 (N.D. Ill. Mar. 22, 2012). On remand, the ALJ should apply the treating physician's checklist in evaluating Dr. Irfan's opinion.

### III. Third Argument

Plaintiff argues that the ALJ improperly discounted her testimony by concluding that her ability to do various activities was inconsistent with her claim that she has lower back pain, has to sleep on an adjustable bed, and can walk just a block and only stand for 15 minutes. Plaintiff secondly argues that the ALJ erred in concluding that she only had conservative treatment. An ALJ's credibility determination should be reversed only if it is patently wrong. *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015). However, an ALJ's decision may be reversed if the ALJ "fail[s] to adequately explain his or her credibility finding by discussing specific reasons supported by the record." *Id.*; *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (a credibility finding "must be specific enough to enable the claimant and a reviewing body to understand the reasoning").

As for plaintiff's first argument, the ALJ observed that plaintiff was claiming that "[h]er back problems make it difficult for her to sit or stand for long periods." Thereafter, the ALJ noted that this and other assertions by plaintiff were inconsistent with her ability to do laundry, dishes, vacuuming, and many other tasks. This Court has no valid basis to question the ALJ's judgment on this point. It is a judgment call whether this varied amount of activities is inconsistent with the ability work a sedentary job with an hourly sit/stand option.

In her reply, plaintiff attempts to bolster her argument by asserting that, although she may do a variety of activities, she "completes [them] in 20 minute increments." To support this assertion, plaintiff cites to two places in her hearing testimony. One of them (R. 29) is her testimony about playing on the floor with her young grandson. She stated: "I'll sit down on the floor with him and I'll try to play with [him] for as long as I can handle it." She stated that this usually lasts "about 20 minutes" before she has to get up and sit on the couch "because the floor

is really hard and it makes it harder to sit." It is difficult to see how this testimony shows plaintiff could not do a sedentary job. If anything, her ability to get down on the floor and play actively for 20 minutes on a hard floor with a toddler supports, rather than undermines, the ALJ's conclusion. The other portion of her testimony is her statement that she typically spends "about 15 to 20 minutes" on Facebook three to four times a day. R. 32. But there is nothing in this testimony stating that the 20-minute interval was due neck pain or mental health problems, as opposed to simply being her preference for how long she likes to be on Facebook at one time.

As for her other argument—that the ALJ improperly found that she only pursued conservative treatments—plaintiff argues that the ALJ overlooked that she consulted with specialists at the Rockford Spine Center, used a TENS unit at home, and was given epidural injections. However, the ALJ did acknowledge this evidence. *See* R. 56 ("The claimant stated that she takes pain medications, uses a TENS unit, has quit smoking, and uses her adjustable bed to alleviate pain."). Moreover, the ALJ's reference to conservative treatment is in a paragraph discussing the mental health evidence. R. 58. There, the ALJ noted that plaintiff never received counseling for these problems and only sought treatment from her general physician. The Court cannot see any error in this reasoning.

**CONCLUSION**

Most of plaintiff's arguments are unconvincing, and do not require remand. However, established and controlling Seventh Circuit law requires remand because of the ALJ's perfunctory "analysis" regarding Listing 1.04(A), despite the Government's assertion of harmless error.

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and the decision of the ALJ is remanded for further consideration.

Date: November 4, 2015          By: _____
                                    Iain D. Johnston
                                    United States Magistrate Judge